### STATE of Tennessee

### v.

### William A. PAYNE, Jr.

Supreme Court of Tennessee, at Knoxville.

Nov. 18, 2004.

---

**22**

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Kathy D. Aslinger, Assistant Attorney General; James N. Ramsey, District Attorney General; and Janice G. Hicks, Assistant District Attorney General, for the appellant, State of Tennessee.

Nancy C. Meyer, Assistant Public Defender, Clinton, Tennessee, for the appellee, William A. Payne, Jr.

**OPINION**

FRANK F. DROWOTA, III, C.J., delivered the opinion of the court, in which E. RILEY ANDERSON, JANICE M. HOLDER, WILLIAM M. BARKER, JJ., and J.S. DANIEL, Sp. J., joined.

We granted the State's application for permission to appeal to determine whether the Court of Criminal Appeals erred in concluding that the entire videotape recording of the defendant's interview with and statements to the police must be suppressed because the police failed to pro-vide the warnings prescribed by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). We have reviewed de novo the videotaped interview and the suppression hearing testimony. The police conducted the interview in three phases, separated by two breaks. Although the defendant was not in custody during the first phase, we conclude that the defendant was in custody and interrogated during the second and third phases of the interview. Accordingly, the second and third phases of the videotaped interview and the statements the defendant provided during those portions of the interview must be suppressed because the police failed to provide *Miranda* warnings prior to initiating the interrogation. Accordingly, the judgment of the Court of Criminal Appeals is affirmed insofar as it vacates the defendant's convictions. However, because the entire interview need not be suppressed, we reverse the judgment of the Court of Criminal Appeals insofar as it dismissed the charges against the defendant. The case is remanded to the trial court for further proceedings consistent with this decision.

### I. Factual and Procedural Background

On August 29, 2000, a fire occurred at the Oak Ridge, Tennessee apartment the defendant, twenty-nine-year-old William A. Payne, Jr., shared with his elderly, bedridden mother, Sylvia Payne. After the fire, Mrs. Payne's body was discovered inside the apartment, but the cause of her death was initially unknown. Oak Ridge police officer Mike Uher testified that he had spoken briefly to the defendant at the apartment complex the night of the fire and had asked the defendant when he had last seen his mother, what her condition had been at that time, and whether she had ever smoked in bed. After further investigation indicated that the fire and

Mrs. Payne's death likely had not been accidental, Officer Uher telephoned the defendant and asked him to come to the police station to discuss the investigation. On August 30, 2000, one day after the fire, Officer Uher, along with Oak Ridge police officer Ron Boucher interviewed the defendant, and this interview was secretly video-taped.

As instructed by Officer Uher, the defendant arrived, apparently on his own, at the Oak Ridge police station between 7:00 and 7:20 p.m. Officers Uher and Boucher escorted the defendant from the lobby to the "standard interview room" located "a couple of feet" away. Neither officer frisked, patted down, nor touched the defendant in any way, and the defendant was not handcuffed. A hidden video recorder already had begun recording when the officers and the defendant arrived at the interview room, but the defendant was never told the interview was being recorded. The videotaped interview is more than two hours in length and includes three breaks during which the defendant remained in the interview room alone.[1] During the first thirty-five minutes of the interview prior to the first break (Phase I), the officers and the defendant discussed generally the victim's condition and the events of the day of the fire. The officers were polite and courteous, and the defendant did not implicate himself in the fire or in his mother's death. Following the first break (Phase II), however, the tone of the interview changed dramatically. Officer Uher intensely questioned the defendant in a demanding and accusatory manner. Eventually, the defendant admitted that he had accidentally hurt his mother's neck while trying to help her and that when he

realized he had injured her, he set her bed afire and fled the scene, returning to work. At this point, the officers recessed the interview for the second break. During this break, the defendant paced around the room and unsuccessfully attempted to open the door on three occasions. When the officers returned (Phase III), Officer Uher resumed the interrogation in an accusatory, combative, and demanding manner. Eventually, the defendant admitted that he had "snapped" and had choked his mother because she had blamed him for her health problems and because she repeatedly had said to him, "I hate you." The defendant requested and was denied permission to telephone his sister. After significant pressing and cajoling by Officer Uher, the defendant provided a written statement and was taken into custody.

Thereafter, the defendant was charged with first-degree murder and aggravated arson. Prior to trial, the defendant moved to suppress both the videotaped oral statements and the written statement, arguing that these statements resulted from custodial interrogation and were inadmissible because the police had failed to provide *Miranda* warnings. At the hearing on the motion, Officer Uher testified, and the videotape recording of the August 30, 2000, interview was introduced into evidence. Officer Uher testified that the recording contained the entire exchange between the defendant and the police.

The trial court refused to suppress the videotaped oral statement but suppressed the defendant's written statement, finding that the defendant had been in custody when he provided the written statement. The defendant subsequently pleaded guilty to second degree murder and aggravated

---

1. The three Phases of the interview were separated by two breaks. A third break occurred during Phase III of the interview when the officers left the defendant alone in the room

to provide his written statement. This third break has not been designated as a dividing line between the interview Phases.

assault[2] but reserved for appeal a certified question of law: "Was Defendant in custody when he gave an incriminating statement such that said statement should be suppressed for violation of Defendant's constitutional rights under [the] Fifth and Fourteenth Amendments?" At the plea submission hearing, the assistant district attorney general recited the factual basis for the plea.[3] Furthermore, the assistant district attorney general acknowledged that without the defendant's statement the prosecution would be unable to prove a "prima facie case." Thus, the trial court approved the guilty plea and certified the dispositive question of law. *See* Tenn. R.Crim. P. 37.

On appeal, two judges of the Court of Criminal Appeals concluded that the defendant had been in custody when he provided the videotaped statement. Because the police had failed to provide *Miranda* warnings prior to interrogating the defendant, a majority of the Court of Criminal Appeals held this statement must be suppressed. Judge Williams dissented, concluding that the entire statement need not be suppressed because a reasonable person would have felt free to leave the interview room *until* that point during the second break, prior to Phase III, when the defendant unsuccessfully tried to open the interview room door.[4] Thus, Judge Williams agreed with the majority that Phase III of the interview should be suppressed, but Judge Williams concluded that Phases I and II of the interview need not be suppressed. Thereafter, we granted the State's application for permission to appeal.

## II. Standard of Review

A trial court's findings of fact in a suppression hearing should be upheld unless the evidence preponderates against those findings. *State v. Munn,* 56 S.W.3d 486, 493 (Tenn.2001). Generally, witness credibility, the weight and value of evidence, and conflicts in the evidence are

2. Pursuant to the plea agreement, the defendant received a fifteen-year sentence for each conviction, and the trial court ordered these sentences served concurrently.

3. The assistant district attorney general stated:

> The defendant was living with his mother in Oak Ridge in Anderson County in an apartment complex. And she had had many health problems and in fact sometimes used a walker and was not very mobile. On this particular date in the indictment [August 29, 2000] she called him at his work to come home and take care of her. People who work with him would say that that was not unusual for her to do that. He was the caretaker there and ... what follows is based on his statement although we have workers at his work who will testify that he did leave work. Based on his statement, he stated that he then went home to take care of his mother, she needed to be cleaned up. He basically lost it; he was somewhat aggravated with her at the time and he began holding her by the neck and her throat and was enraged and upset with her at the time. The autopsy shows that she died as a result of manual strangulation. There was a broken hiatal bone in her throat and the fire did not kill her. He did say that after she was not moving anymore that ... he panicked at that time and he set fire to her bed. This was in an apartment complex; the fire did cause damage to their apartment; however, the other people in the other apartments got out and it did not cause damage to the other people's apartments.

> The defendant did not agree with the prosecution's statement of facts and accepted them only to facilitate appellate review of the certified question of law.

4. Judge Williams also concluded that the certified question of law was not dispositive and that the appeal should be dismissed. In this Court, the State agrees that the majority of the Court of Criminal Appeals properly accepted the assistant district attorney's statement that prosecution of the defendant cannot go forward without the defendant's statement.

matters for the trial court to decide, with the prevailing party entitled on appeal to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn from the evidence. *Id.* However, when a trial court's findings of fact are based solely on evidence that does not involve issues of witness credibility, appellate courts are as capable as trial courts of reviewing the evidence and drawing conclusions. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn.2000). In such circumstances, a trial court's findings of fact are subject to de novo appellate review. De novo review applies in this appeal because, at the suppression hearing, Officer Uher testified that the videotape fully and accurately depicts the police interview. Therefore, determining whether the defendant was in custody is a fact-intensive inquiry which demands a careful, de novo review of the videotaped interview, followed by an application of the governing legal principles. Thus, the following detailed discussion of the videotaped interview is necessary.

### III. Summary of the Videotape Recording

The interview room appears from the videotape to be a square room approximately eight to ten feet wide and deep, with a single door. The recording equipment was located just to the immediate left of the doorway; thus, the door itself is not visible. The perspective of the interview room in the recording is as it would appear to a person entering the room from the doorway. No windows are visible. A small, wooden rectangular table or desk was located against the back wall in the left corner of the room. Officer Uher sat in a chair on the front side of the desk, facing the defendant and the back wall. The defendant sat in a chair next to the desk, near the back corner of the room on the right, facing the door. Officer Bouch-er sat in a chair near the middle of the room, slightly to the left of Officer Uher's chair, facing the defendant. The officers were not then seated directly between the defendant and the door.

Officer Uher conducted the interview (Phase I). He advised the defendant that he did not have to be there, that he did not have to talk to the police, and that the police appreciated the defendant talking to them. Officer Uher began the interview with general background questions which the defendant answered. Officer Uher then questioned the defendant about his mother's physical condition. The defendant explained that his mother had been in poor health for several years, that she had been basically bedridden since March of 1999, and that he had been her primary caregiver for nine years. The defendant freely responded to Officer Uher's questions and explained that he and his mother had argued frequently during the previous six months because he had tried to convince her to see a doctor for her declining physical health and for depression, but she had resisted his suggestion. Officers Uher and Boucher appeared cordial and empathetic, and they spoke in conversational tones. Officer Boucher asked the defendant if he had ever considered a health care center for his mother, and Officer Uher asked whether the defendant had seen a doctor recently. The defendant acknowledged that he had seen a doctor because he had not been sleeping well.

However, approximately nineteen minutes into the interview, the defendant asked Officer Uher, "Did I do something wrong? Please tell me. I need to know." Officer Uher responded, "I didn't say you did anything wrong. I'm just asking you. We're just trying to find out what's going on because you've been under a lot of stress yourself." Officer Boucher offered the defendant a soft drink, and the defen-

dant requested water. The defendant then assured Officer Uher that he would change places with his mother if he could. The defendant said, "I don't understand what is the meaning for this [sic]." After Officer Uher explained that the interview was standard practice when someone had died, the defendant asked, "How did she die?" Officer Uher indicated the police were still waiting for the autopsy report to determine the exact cause of the death. The defendant then asked, "What started the fire?" Officer Uher responded, "I don't know. Maybe smoking in bed."

After Officer Boucher returned to the room with the defendant's water, Officer Uher resumed questioning the defendant. Approximately thirty-two minutes into the interview, the defendant became visibly upset and asserted, "I would never hurt her. I wouldn't." The defendant then asked the officers, "Do you think I had something to do with this?" When Officer Uher responded, "I didn't say that," the defendant became even more upset and stated, "Don't tell me you didn't say that. I want to know, do you think that?" Officer Uher again responded, "I didn't say that, did I? Calm down." Officer Uher stood and told the defendant, "I want you to get your bearings back just a little bit and let us talk. We'll be right back." As the officers were leaving the room, the defendant was talking to them. Although some of the defendant's remarks are inaudible, the defendant can be heard asking the officers to get someone "on the phone." During this five-minute break the defendant paced and drank water.

When the officers returned to the room (Phase II), Officer Boucher moved his chair so that he was seated between the defendant and the door. Officer Uher stood near and somewhat over the defendant. Officer Uher advised the defendant that police investigators, fire department and arson investigators, and forensic experts at the University of Tennessee had reviewed the facts and circumstances surrounding Mrs. Payne's death and had concluded that something suspicious had occurred at the apartment. Officer Uher further advised the defendant that the circumstances surrounding the case clearly indicated the defendant had some knowledge of what happened at the apartment. Officer Uher informed the defendant that he believed something else may have happened "where your mom was injured, maybe your mom got hurt." Officer Uher said, "I think it was an accident. It was a mistake. I think you may want to talk about it. I think you're afraid." The defendant responded: "I'm not afraid. I wouldn't dare hurt her."

Officer Uher then told the defendant that his mother had an injury "consistent with how you describe trying to help her, trying to clean her, trying to do things for her. You need to think of what happened yesterday. It affects your life too." The defendant asked, "What is the injury?" and commented, "I swear I'm not keeping nothing. I don't know. Either that or I just can't remember." After further discussion, the defendant admitted that he and his mother had argued on the day of her death because she had accused him of hurting her arm and leg. The defendant demonstrated how he had lifted and cleaned up his mother, who was incontinent. The defendant admitted he could have accidentally bruised his mother's shoulders when lifting her, but he denied injuring her neck, stating "I know I didn't hurt her neck. I didn't touch her neck." Officer Uher told the defendant that he believed an accident had happened and that he did not believe the defendant had hurt his mother on purpose, stating: "I've looked at the facts and evidence in the case and the facts and evidence dictate that [that] is true." The defendant re-

sponded, "I honestly don't know. I want to see the report." The defendant maintained that he did not know how he would be able to go on living without his mother and explained that they had planned to move to San Diego in October because of her health. Officer Uher then commented, "Your mom was dead before the fire started. So was there an accident? Maybe a candle tipped over or something?" Appearing frustrated and upset the defendant replied, "Nothing tipped over while I was there. She was okay. I'm not lying to you. I'm not. I didn't do anything." At this point, Officer Uher, appearing angry and frustrated, stated in a loud voice:

Bill, I don't want to hear the no anymore because there's two things happened here, okay, two things. Either this happened purposefully or an accident happened at your house. And that's it. Two things happened. Now either it happened purposefully or an accident. And I don't think you're a malicious person. I don't want to hear "no" anymore because I know better. The case indicates better. The facts and evidence are better than that. Something happened. Your mom lost her life. We're trying to help. I don't think you're a malicious person. I think an accident happened. If it was just an accident, let's get it done, let's write it up, it was still an accidental death. Nobody meant to hurt anybody, but the way its looking right now, I can't write it up as accidental death. Now you need to shoot straight with me, Bill, no matter how bad it hurts.

After again asserting his innocence and stating that he would like to change places with his mother, the defendant asked, "How did she die? How did she die? Tell me." Officer Uher responded, "I'll tell you everything I know if you tell me what happened in the accident." Officer Uher admonished, "It's time to talk about the

truth," and repeatedly urged the defendant to "talk to me, tell me about this accident" and pressed the defendant to "talk to me, talk to me now."

Approximately one hour into the increasingly overbearing interrogation, the defendant said, "I may have accidentally hurt her neck when I was trying to help her sit up and stuff." Officer Uher questioned: "And then what happened? Did you get scared? She was unconscious wasn't she? Bill, tell me the truth?" The defendant replied, "She may have been I don't know." Officer Uher continued: "She was unconscious yesterday. Were you scared? Did you run out of the house?" The defendant responded, "I didn't run out." At this point, Officer Uher demanded in a loud voice, "Bill, talk to me, talk to me now! Look at me and talk to me! What happened to her neck?" The defendant again conceded that he could have accidentally hurt his mother's neck as he was lifting and positioning her to wash her back. The defendant demonstrated how he lifted and positioned his mother and indicated how his arm may have been placed accidentally around her neck. Officer Uher again then admonished the defendant: "Tell me everything. Tell me everything Bill. Or, I'll tell you what it looks like. So you tell me everything. No, you tell me everything, because you won't like what it looks like. You won't like at all what it looks like, I promise you. Your mother was unconscious when you left, so what happened next?" The defendant claimed that he simply had left the apartment and gone back to work, but Officer Uher disagreed, declaring emphatically:

Bill you got scared. You got scared yesterday. Your mother was passed away when you left. And you knew it. And it was an accident. And you tried to cover it. I understand that. I under-

stand it Bill, tell me about it so it doesn't look like you intentionally killed your mom. Bill, talk to me now! Look at me and talk to me! You started the fire. Bill, with what, a match? Did you just light the blanket and leave? Talk to me Bill! Did you pour something on the bed and do it, or did you just light it? Bill its time to get it off your chest right here right now so we know it was an accident and you just got scared. What was it?

The defendant replied, in a soft voice, "A match, I guess, you know, a match." Officer Uher asked, "A book of matches, or a match?" The defendant replied, "A match." Officer Uher stated, "One match out of a red book of matches. And where did you light the bed ... toward the middle?" When the defendant answered, "Yeah, I guess, I mean, you know," Officer Uher replied, "That's what we thought happened, okay. I don't think you'd hurt your mom on purpose Bill, but I think you got scared. And that's what we thought all along. I respect you for telling me the truth, okay. We're all human and we all make mistakes, Bill. Do you hear me? I'm gonna give you a few minutes to get it together. I want you to sit and think." As the officers stood to leave the room, the defendant in an unsteady voice inquired, "What's gonna happen to me?" Officer Uher responded, "We're just gonna talk some more. We're just gonna talk. We're just gonna talk. You're gonna be fine." Officer Boucher advised, "Just get your composure and we'll be right back, okay." Officer Uher instructed the defendant, "Just relax for a few minutes."

After the officers left, the defendant paced the room. He walked towards the door on several occasions, and on three occasions he appeared to attempt unsuccessfully to open the door to leave the room. Although the door itself is not visible on the video recording, the defendant can be seen reaching towards the door knob, and the sounds on the recording indicate that he was trying to open the door. Furthermore, when the officers returned to the room just after the defendant's third attempt to open the door, the officer's comments confirmed that the door was stuck, if not locked. Officer Uher knocked, entered the room and stated, "That door hangs up." Officer Boucher agreed, stating, "Yeah, we've got to get someone in to shave this." Officer Uher stated, "I didn't want to hit you. That's why I knocked first. You've got to shove that door real hard." Officer Boucher commented, "It's been shaved once or twice."

Officer Uher then resumed the interview (Phase III), stating, "Bill, there's a couple of things we still need to talk about. A couple things that still don't make sense." Both officers were seated facing the defendant, with Officer Boucher's chair between the defendant and the door. Officer Uher then asked, "When you left the second time, you didn't close the front door all the way, did you?" The defendant, becoming increasingly agitated, said, "I honest to God thought I did. I'm not lying. What reason do I have to lie?" When Officer Uher urged the defendant, "Listen to me now and calm down," the defendant commented, "I'm totally confused. I honest to God don't understand this." Officer Uher reassured the defendant, "I'm trying to help you, okay. Now, I want you to relax and pay attention to me. Like I said, enough has been lost already." Officer Uher then asked whether the defendant's mother had been resisting the defendant's attempts to wash her, and the defendant agreed she had. Officer Uher asked, "Did you grab her throat with your hands Bill?" In a soft voice, the defendant denied doing so. When Officer Uher responded, "Bill, listen to me," the defendant leaned back in

his chair, hit the desk with his hand, and requested, "I want to talk to my sister. This is ridiculous." Officer Uher leaned forward in his chair, struck the desk with his hand, and demanded in a very loud voice:

Pay attention to me! This isn't ridiculous. Now you can knock that off. I told you when you walked in this room there was gonna be no more no's. I know what happened there. Now, did you know that William Bohannon [sic] invented a machine that uses super glue to where [sic] we can get thumb and finger prints off the human body? Did you know that? That if I grab your arm like this and let it go, [Officer Uher grabs the defendant's arm] my finger prints are on your skin. How would your thumb print and your finger prints get around your mom's neck?! How?! I don't like raising my voice. Please don't raise yours anymore. I want to know if your mom was laying down when you grabbed her neck or if she was sitting up? Tell me right now!

When the defendant indicated he simply had placed his hand on his mother's neck so that he could clean her, Officer Uher disagreed stating, "No, you put your hand on her neck. No, you squeezed her neck. Was she lying down or was she sitting up when you squeezed her neck. I'll know if you're lying." When the defendant responded, "I honest to God remember her sitting up," Officer Uher stated:

She was lying down on the bed because of the hemorrhaging. Now, do you want to quit lying to me. You got frustrated and you put your hand around your mom's neck, did you not? Yes you did. Tell me, yes or no. Yes you did. I know, okay I know what you're going through, and I'm trying to help you with it, because if you lie, Bill, its only gonna be worse. Do you understand that? If

you lie, and we can prove you lied, it only gets worse against you. Okay? It makes you look like a cruel and malicious person. You acted out of character. Are you sorry for what happened?

Visibly shaken, the defendant, pointing toward the door, replied, "My God yes, I wish it were me in there!" Officer Uher responded, "I know you're sorry for what happened. I can tell. Then you need to tell the world you're sorry for what happened. And lying don't do it. Do you understand that." The defendant emphatically stated: "I am sorry!" Officer Uher replied: "Lying don't do it though, Bill. What made you, I don't think you're a mean person, what made you choke your mom?" The defendant explained, "She just kept saying over and over 'I hate you, I hate you,' and I just snapped."

At Officer Uher's request, the defendant used Officer Uher's wrist to demonstrate how he had choked his mother. The defendant explained that his mother had gone limp after he had grabbed her and had shaken her for a "second." Officer Uher commented: "It didn't take much because your mom was frail. And that's what scared you because I don't think you meant to do it, did you?" With his head in his hands, the defendant replied, "You know damn well I didn't." Officer Uher then replied, "You're right, I know damn well you didn't. Is that why you started the fire, because you were scared?" As the defendant continued to look down with his head in his hands, Officer Uher commented: "I know you're sorry. I know you're sorry." The defendant leaned his head on the table and said: "Oh God, I just want to die." Patting the defendant's shoulder, Officer Uher stated: "I know you're sorry, Bill. I know you're sorry." Then, Officer Uher asked, "Did you go back to work, Bill, after that happened?" The defendant replied, "I did," and then asked, "What's gonna happen to me?" Of-

ficer Uher replied, "I don't know, tonight Bill you're probably gonna have to go to jail." The defendant said: "I want to call my sister. I want to call my sister." Officer Uher replied: "We'll let you make a phone call here in a little bit, but for right now you are in custody, okay. You are no longer free to go anywhere. You understand that." The defendant again put hand on his head and looked down. Officer Uher then stated:

> Listen to me Bill. There's something I do want you to see if you want to do. I'm going to create some forms and put some forms here on the table, paper work. And you're a pretty good writer. You do a lot of computer stuff. And I want you to tell me the truth about something because this is something that's bothering me, okay. I can see you're remorseful, alright, but I know you've also had a hard time with your mom the last nine years. Are you *really* sorry for what happened?

In a whisper, the defendant replied, "My God, yes." Officer Uher inquired, "Truthfully, sorry?" The defendant reiterated, "You're damn right I am!" Officer Uher then explained: "I want you to tell the attorneys that are gonna work your case that you're sorry, okay. Because you're gonna have a prosecutor and your own defense attorney and a judge. Those are three attorneys. I want you to write down everything that happened and how it happened." Upon hearing this, the defendant again stated, "I want to talk to my sister!" Officer Uher replied, "Your sister's not coming here right now." Gesturing with his hand, the defendant emphatically stated, "I want to talk to my sister by phone! I know my rights. I know my rights!" Officer Uher then replied, "And is there anywhere in your rights that says we have to allow you a phone call to your sister?" The defendant replied: "I know my rights under *Miranda*." Officer Uher acknowl-

edged, "You're allowed a phone call." The defendant reiterated, "I know my rights under *Miranda*." Officer Uher responded, "What are they Bill? I want you to explain them to me."

Approximately one-hour and twenty-seven minutes into the interview, after the defendant had attempted unsuccessfully to enumerate his *Miranda* rights, Officer Uher advised the defendant of his rights. After doing so, however, Officer Uher stated:

> And I'll let you call your sister, alright. Now Bill I want to tell you something. Now is not the time to get irate over what happened because you want to know what you're doing? I'm gonna explain something to you. You're not showing me that you're sorry for what happened to your mom. You're showing me somebody that's full of bottled-up anger. Do you understand that?

When the defendant replied, "I feel like I'm in a damn nightmare, and I can't wake up." Officer Uher replied:

> You've been living it a long time, haven't you Bill? Haven't you? I know you have, and I feel for you, okay. I'm the one who's sitting here trying to help you, okay.... I don't think you planned this. You didn't plan this for two weeks, did you? No! It just happened, Bill. Like you said you went nutso [sic] for a minute, okay. You lost it, isn't that what you said? Then give me a statement, that's all I ask you to do. You've already given me a statement. You've already talked to me, but I want it on paper.

The defendant again asked, "But what will happen to me if I do that?" Officer Uher replied, "Nothing more than will happen if you don't. The only thing that can happen is that statement will help you."

After summarizing his understanding of the defendant's verbal statement, Officer Uher urged the defendant to provide a written statement, admonishing the defendant:

> If you don't, do you know what it looks like? You planned to kill your mom and almost got away with it. Now its up to you. Give me the statement. You can make the phone calls. You can call your lawyer. You can do whatever you want. You can call your sister. Whatever. Are you willing to give me a statement?

The defendant indicated his willingness to provide a written statement by requesting paper. The officers provided the paper, and before leaving the room, Officer Uher cautioned the defendant, "Bill, look at me. This is the most important thing. Don't make up any lies in this statement." Officer Uher warned, "If this case ended up in a courtroom, if they proved you're lying, it isn't gonna help you. Do you understand that?" The defendant then asked, "I just want to know what's gonna happen to me?" Again, Officer Uher advised the defendant that he would have to go to jail, but possibly would be released on bond.

When the officers returned to the room approximately fifteen minutes later, Officer Uher read aloud the defendant's statement. Officer Uher disagreed with that portion of the statement which indicated the defendant was cleaning up his mother when he grabbed his mother's neck. When the defendant asked Officer Uher to "tell" him what to say, Officer Uher refused, stating:

> I'm not gonna tell you what to say. I'm not gonna tell you what to say. You told me that you snapped. You said that you snapped, and you stood up and grabbed my arm like you grabbed her neck. I'm

not gonna tell you what to say. I want you to make sure you're not lying and tell me the truth.

Officer Uher then inquired of the defendant: "Was she lying down?" and "Are you sorry for what happened?" Officer Uher advised, "You need to write it down. Put your initials at the end of it." Officer Boucher then left the room

At this point, approximately one hour and fifty minutes into the interview, appearing listless and exhausted, the defendant again asked Officer Uher, "What point do I have to live?" Officer Uher responded: "Sign right here." The defendant countered: "Before I do, please tell me what reasons I have to live?" Officer Uher replied:

> You've got a lot of reasons to live. We all make mistakes Bill. Not everybody has been through what you've been through. Do you understand that? It's not easy my friend. What you've been going through for several years with your mom is not easy.

The defendant appeared to be crying when he signed and initialed the statement. As the interview concluded at 9:46 p.m., the defendant again asked: "Please let me talk to my sister." The officers agreed, but they told the defendant he would not be left alone to make the telephone call. The officers checked the defendant for weapons and then left the room, concluding the video recording.

### IV. Custodial Interrogation

■ The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."[5] In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966),

---

5. This privilege against self-incrimination applies through the Fourteenth Amendment to state governments as well as to the federal government. *Malloy v. Hogan,* 378 U.S. 1, 6, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

the United States Supreme Court concluded that in the context of "custodial interrogation" certain procedural safeguards are necessary to safeguard this privilege against compulsory self-incrimination. *Id.* at 444, 86 S.Ct. 1602. More specifically, the Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* Those safeguards included the now familiar *Miranda* warnings—namely, that the suspect be informed "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Id.* at 479, 86 S.Ct. 1602. If the police fail to provide these warnings, any statement obtained as a result of custodial interrogation will not be admissible at trial during the prosecution's case-in-chief, even if the statement is otherwise voluntary.[6] The *Miranda* Court was concerned that the "interrogation environment" created by interrogation and custody would "subjugate the individual to the will of his examiner" so as to undermine the privilege against compulsory self-incrimination. *Id.* at 457–58, 86 S.Ct. 1602. The United States Supreme Court recently reaffirmed that "*Miranda* and its progeny ... govern the admissibility of statements made during custodial interrogation in both state and federal courts." *Dickerson v. United States,* 530 U.S. 428, 432, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000); *see also State v. Walton,* 41 S.W.3d 75, 82 (Tenn.2001). Consequently, if the defendant's statement

resulted from custodial interrogation, the statement must be excluded from evidence because the police failed to provide the defendant *Miranda* warnings. *Oregon v. Elstad,* 470 U.S. 298, 307, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985); *Walton,* 41 S.W.3d at 86.

*Miranda* defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602. Thereafter, the United States Supreme Court has explained that "interrogation" refers not only to express questioning but also to any words, actions, or practices that the police should know are reasonably likely to elicit incriminating information from a suspect. *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *see also Walton,* 41 S.W.3d at 85. That the defendant was interrogated concerning his mother's death is not at issue in this appeal. The defendant clearly was interrogated, both by express questioning and by words, actions, and practices reasonably likely to elicit incriminating information, indeed *designed* and *intended* to elicit incriminating information.

 The disputed issue in this appeal is whether the defendant was "in custody" at the time of the police interrogation. To resolve this issue, we consider "whether, under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest." *State v. Anderson,* 937 S.W.2d 851, 855 (Tenn.1996). This test is "objective

---

**6.** Statements given in the absence of *Miranda* warnings may be used for impeachment purposes on cross-examination. *Oregon v. El-* *stad,* 470 U.S. 298, 307, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).

from the viewpoint of the suspect, and the unarticulated, subjective view of law enforcement officials that the individual being questioned is or is not a suspect does not bear upon the question." *Id.* Factors relevant to this objective assessment include:

> the time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

*Id.*

▮ With these factors in mind, we turn to the record in this case. Officer Uher contacted the defendant and scheduled the interrogation for early evening, 7:00 to 7:20 p.m. The defendant agreed to talk to the police, and he apparently drove himself to the police station. The defendant was not patted down, frisked, handcuffed, or touched in any way upon his arrival at the police station. He was escorted to the small interview room by two officers. Approximately thirty seconds into the interrogation, Officer Uher advised the defendant that he did not have to come into the police station, that he did not have to talk to the police, and that the police appreciated him talking to them. Both officers remained in the small inter-

view room for practically the entire interrogation, with Officer Boucher briefly leaving the room twice, once to bring the defendant water and once to retrieve paper for the defendant's written statement. When the interview began (Phase I), the officers appeared empathetic and courteous, listening as the defendant recounted the events of the day of the fire. Officer Uher sat at the desk, near the defendant, while Officer Boucher sat near the center of the room. During this portion of the interview, neither officer blocked the defendant's access to the door.

When the officers returned to the room after the first short break (Phase II), however, the tone of the interview changed, as did the officers's location in the room. Officer Uher stood near and somewhat over the defendant for much of this portion of the interview. Furthermore, Officer Boucher moved his chair so that it was closer to the defendant and partially blocking the defendant's access to the door. Officer Boucher also sat forward in his chair, leaning toward the defendant. Officer Uher's tone of voice and demeanor were more demanding and accusatory during this portion of the interview, and Officer Uher confronted the defendant with his own suspicions which were, Officer Uher claimed, also shared by other police investigators, fire department and arson investigators, and forensic investigators at the University of Tennessee. Officer Uher ignored the defendant's requests to speak with his sister. In fact, whenever the defendant made such requests or maintained his innocence, Officer Uher raised his voice at the defendant, pressured the defendant to "talk to me, talk to me now," and threatened the defendant, saying things like "you won't like what it looks like" and "tell me about it so it doesn't look like you intentionally killed your mom." At no time after the first minute of the more than two-hour interrogation did the

officers advise the defendant that he was free to refrain from answering questions or to end the interview. During the second break, the defendant attempted to leave the interview room three times, but he was unable to do so. Although the officers's comments upon returning to the room implied that the door had been stuck, not locked, the fact remains that the defendant tried three times to open the door and was unable to do so.

When the interview resumed after the second break (Phase III), the officers again failed to advise the defendant that he was free to leave. Office Uher resumed the questioning, accusatory, insistent, and combative in tone, often raising his voice and hovering over the defendant with the bulk of his body. Again Officer Uher confronted the defendant with his suspicions of guilt and with evidence that Officer Uher claimed implicated the defendant. In fact, some of the evidence Officer Uher mentioned, such as the finger and thumb print evidence, allegedly recovered by a machine that used super glue, simply did not exist. When the defendant insisted that he wanted to speak with his sister, Officer Uher became angry, struck the table, and yelled. Even after advising the defendant that he was in custody and no longer free to leave, Officer Uher delayed advising the defendant of his *Miranda* rights until the defendant again asked to telephone his sister. After finally advising the defendant of his *Miranda* rights, Officer Uher insisted that the defendant provide a written statement before telephoning his sister. Considering the totality of the circumstances in this case, we conclude that a reasonable person in the defendant's position would have considered himself deprived of freedom of movement to a degree associated with a formal arrest at the latest when the interview resumed after the first break (Phase II). At this point, the demeanor, tone, and questioning mark-edly changed, as did the officers's physical locations in the room. Not surprisingly, the defendant made all of the incriminating statements after this point in the interrogation.

Regardless of the State's argument to the contrary, the facts and circumstances of this case are distinguishable in at least three crucial respects from the facts and circumstances in *Munn,* where this Court concluded the defendant was not in custody. First, the defendant in *Munn,* was advised "throughout the interview that he was not under arrest and was free to leave at any time." 56 S.W.3d at 499. In this case, the defendant was only once advised that he was free to leave—thirty seconds into the more than two-hour interview. Secondly in *Munn* the defendant's parents were either present in the interview room or they remained just outside the room when the defendant was being interviewed alone, and even then, they were allowed to enter the room if they chose to do so. *Id.* Here, the defendant was isolated and denied the opportunity to telephone his sister, even when he specifically asked to do so. Finally, even after he had confessed to killing his roommate, the defendant in *Munn* believed he would be able to go home with his parents and return to the police station the following Monday. *Id.* Here, nothing in the record indicates that the defendant believed he was free to leave. To the contrary, in this case the totality of the circumstances clearly indicate that a reasonable person in the suspect's position would not have considered himself free to leave. This Court pointed out in *Anderson* that determining whether a suspect is in custody and entitled to *Miranda* warnings is "a very fact specific inquiry." 937 S.W.2d at 855. Unlike *Munn,* the facts of this case demonstrate, as the majority of the Court of Criminal Appeals concluded, that the defendant was

in custody and entitled to *Miranda* warnings at the latest when the interview resumed following the first break (Phase II). Therefore, the majority of the Court of Criminal Appeals properly concluded that the defendant's inculpatory statements stemming from custodial interrogation should be suppressed.

### Conclusion

Based upon the foregoing analysis, we affirm in part the decision of the Court of Criminal Appeals which suppressed the defendant's statements and vacated his convictions. However, because the entire interview need not be suppressed, we reverse the Court of Criminal Appeals's decision insofar as it dismissed the charges against the defendant and remand this case to the trial court for further proceedings consistent with this decision. Costs of this appeal are taxed to the State of Tennessee, for which execution may issue if necessary.