IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs January 8, 2013

**STATE OF TENNESSEE v. KEWAN CALLICUTT**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 10-04170     Lee V. Coffee, Judge**

**No. W2011-02516-CCA-R3-CD - Filed July 5, 2013**

Defendant, Kewan Callicutt, was indicted by the Shelby County Grand Jury for attempted especially aggravated robbery. Defendant was convicted as charged by a jury and sentenced by the trial court to serve 12 years in the Department of Correction. On appeal, Defendant asserts that: 1) the trial court erred by denying his motion to suppress his statements to the police because he was under the influence of a drug or intoxicant when he waived his *Miranda* rights; 2) there was insufficient evidence to support his conviction; and 3) his sentence is excessive. Finding no error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which JERRY L. SMITH and D. KELLY THOMAS, JR., JJ., joined.

Stephen C. Bush, District Public Defender; Phyllis Aluko, Assistant Public Defender; and Mary Katherine Kent, Assistant Public Defender, Memphis, Tennessee, for the appellant, Kewan Callicutt.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Anne Schiller, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

Deangelo "Gold Mouth" Johnson, the victim, testified that on December 14, 2009, between 8:00 and 9:00 p.m., he was "stranded" in the South Memphis downtown area and was "looking for a ride home." He called Cierra Lewis and offered her ten dollars to pick him up. He also "had got her weed because she loved weed." When Cierra arrived to pick up Mr. Johnson, he saw that there were two males and another female in her car. One of the

males in the car was Defendant, whom Mr. Johnson heard Ms. Lewis refer to as "Murder." Mr. Johnson asked Ms. Lewis to drive him to his aunt's house in East Memphis, "about fifteen to twenty minutes" away. Mr. Johnson testified that Ms. Lewis and Defendant were sitting in the backseat of the car. The other female, Jessica, was driving the car. Jessica said she was "looking for somebody," and they drove to "another neighborhood." They then drove to Emerald Square Apartments, where Mr. Johnson's aunt lived. Mr. Johnson got out of the car and handed Ms. Lewis ten dollars. Ms. Lewis told Defendant to put some jackets in the trunk. Mr. Johnson was standing beside the car when Jessica unlatched the trunk. Mr. Johnson began walking towards his aunt's house, and Defendant ran after him with "a shot gun - a rifle or something." Defendant told Mr. Johnson to lay down and give him his money. Mr. Johnson raised his hands. Mr. Johnson heard "some girls' voices" say "'Come on, go.'" Mr. Johnson testified that Defendant then shot him in the leg, and he "hit the ground." Mr. Johnson closed his eyes and "started crawling." When he opened his eyes again, he saw his money on the ground. He testified that he had "[a]bout two fifty - two seventy - around that much." The money was "torn apart," and Mr. Johnson believes that the money had been hit by buckshot.

Mr. Johnson testified that he had undergone one or two surgeries on his leg and was hospitalized for "[a]bout two and a half weeks." He did physical therapy while he was hospitalized, and he was prescribed pain medication for one month after he was discharged from the hospital. Mr. Johnson identified Defendant in a photo lineup as the person who shot him.

Memphis Police Officer Lawrence Taylor responded to the shooting. When he arrived, Mr. Johnson was lying on the ground, and he "had blood on him." Officer Taylor called for an ambulance. He found a shotgun shell on the pavement by the victim.

Detective Robert Wilkie testified that he went to the hospital to show the victim a photo lineup on December 17, 2009. He testified that it took the victim only "a few seconds" to identify Defendant as the person who shot him.

Detective Byron Braxton interviewed Defendant on December 17, 2009. Defendant signed a form acknowledging his rights at 3:14 p.m. Detective Braxton testified that Defendant initially denied any involvement in the shooting. Defendant tested positive for the presence of gunpowder residue on his hands, and he told Detective Braxton that he had recently fired a weapon in the air, but he stated that he was not in the area of the shooting. At 6:06 p.m., Defendant gave another statement to Detective Braxton. During the interview with Detective Braxton, Defendant stated that on December 14, 2009, he shot someone named "Gold Mouth." He stated that "[i]t was Jessica and CC [Cierra Lewis]'s idea to rob dude." Defendant told Detective Braxton that Ms. Lewis told him that the victim had money,

and that they had discussed robbing the victim "a day or two before he got robbed." Defendant stated that they picked up the victim and drove him to his aunt's apartment. They were still "debating on whether or not" to rob the victim when they dropped him off. As the victim got out of the car, Ms. Lewis said, "go, go" to Defendant, and Jessica popped the trunk. Defendant went to the trunk and got out a shotgun and followed the victim. He told Detective Braxton, "Then I got close enough, and I was telling him to get down on the ground, and he was saying he ain't got nothing. I told him like five times. Like the fifth time, he ain't listened. I was trying to shoot it to the left side of him, but somehow he got hit in the leg with it. When he was falling to the ground, I heard him screaming." Defendant then left with Ms. Lewis and Jessica Thomas. They "picked up some pills" and went to Ms. Lewis's house. Defendant stated that he had never met the victim before the incident. He stated that they targeted the victim "[b]ecause CC [Lewis] say he be having stacks." Defendant stated that he did not intend to kill the victim but that "[i]t was [his] intention to get the money." He stated that he later took the gun to his cousin's house. Detective Braxton testified that Defendant did not appear to be under the influence of drugs or alcohol and that he was alert, coherent, and responsive to his questions. Defendant signed the written statement.

*Sentencing hearing*

At the sentencing hearing, the State introduced Defendant's presentence report, as well as a certified copy of the judgment for Defendant's 2003 conviction for aggravated robbery, for which he received a sentence of eight years. The State presented no other proof at the sentencing hearing.

Defendant testified at the sentencing hearing that he had lived in Shelby County since he was twelve years old. He testified that he had a juvenile record and that he had been referred for a psychological evaluation. He did not remember his diagnosis, but he testified that it was "extreme emotionally or something. But then the other one, I forgot what it was." He testified that he did not complete his sessions because his family was unable to pay for them. Defendant testified that he completed two anger management programs while incarcerated on the charge in this case. Defendant testified that he lost his job prior to the offense in this case and that caused him to make "the wrong choice." Defendant testified that he was charged with assault and vandalism in 1999. Defendant also acknowledged an aggravated assault charge in 1999 that was amended to assault. He testified that the offense was against a female named Cierra, but not Cierra Lewis, who was also charged in this case. Defendant testified, "[m]e and her had some problems, and they were saying that I had – that I had tortured her or some stuff, and I had burned her with an iron." Defendant also had a theft charge in 1999. Defendant did not recall charges of stalking and aggravated burglary. He acknowledged that he was charged with theft of a vehicle, aggravated assault, reckless

endangerment, and vandalism over $500 in 2002. He testified that he and another man followed the victim home and "she had got carjacked for a truck, and [they were] put on a high-speed chase, and [they] got locked up for that." Defendant testified that since he had been incarcerated for the offense in this case, he had been "saved now through the Holy Spirit" and he was "a changed man[.]"

At the conclusion of the sentencing hearing, the trial court noted that it had considered the statements and arguments of counsel, the facts presented at trial, the presentence report, Defendant's testimony, statistical data, enhancement and mitigating factors, the principles of sentencing, and Defendant's potential for rehabilitation. The court classified Defendant as a Range I standard offender. The court found that Defendant had one prior conviction of aggravated robbery and applied it as an enhancement factor that Defendant had a previous history of criminal convictions in addition to those necessary to establish the appropriate range. The court noted that although Defendant was charged with that offense at the age of 17, Defendant was prosecuted as an adult and sentenced to eight years, and the court gave that factor "great weight." The court also gave "great weight to [Defendant's] juvenile history." The court also found that Defendant was a leader in the commission of an offense involving two or more criminal actors and noted that Defendant "had the shotgun."

The trial court rejected defense counsel's argument that Defendant was acting under the domination of another person and found that Defendant "was, in fact, a willing participant in this robbery, by his own [ad]mission from the statements that he gave the police in his second statement was because he thought [the victim] had a large sum of money on him, and he was a willing participant in which he and other persons agreed to commit this robbery for money." The court gave "some weight to the fact that [Defendant] did not plan the robbery itself; but [Defendant] was recruited, and he was a willing participant in this crime." The trial court sentenced Defendant to serve 12 years, the maximum sentence within the applicable range. The trial court further found that the length of Defendant's sentence made him ineligible for probation, but the court found that even if it had considered probation as an alternative sentence, "confinement in this case is necessary because the defendant does have a long history of criminal conduct" and that measures less restrictive than confinement have been frequently and recently applied unsuccessfully. The court noted that efforts to rehabilitate Defendant had failed. The court also noted that "deterrence is particularly suitable in this case[.]"

**Analysis**

*Motion to suppress*

Defendant contends that the trial court erred in denying his motion to suppress his statement to the police because it was elicited without a voluntary and knowing waiver of his *Miranda* rights. Defendant argues that his statements to Detective Braxton were not freely and voluntarily given because he was under the influence of drugs at the time.

At a pretrial suppression hearing, Detective Braxton testified that prior to interviewing Defendant on December 17, 2009, he advised Defendant of his *Miranda* rights. Defendant indicated that he understood his rights and signed his initials on the advice of rights form. The interview with Defendant lasted approximately one and a half hours. Defendant initially told investigators that he "had some type of run-in with some individuals, and he fired a weapon in the air." Defendant denied any involvement in the shooting in this case. Defendant signed the first statement. Defendant then asked to speak to Detective Braxton again, and Defendant gave a second statement, in which he told of his intention to rob the victim because he had heard "that [the victim] had stacks of money." Defendant stated that "he pulled a shotgun on [the victim], and told him to get down, and [Defendant] said that [the victim] didn't respond to his orders fast enough, and [Defendant] felt that [the victim] was armed and might go for a weapon. So, that's when he shot . . . the victim." Defendant signed the second statement. Detective Braxton testified that Defendant did not appear to be intoxicated during either statement. Defendant was taken into the interview room at 1:37 p.m. At 2:27 p.m., Detective Braxton "checked on him" and gave him a cup of water to drink. Defendant "seemed calm." Defendant signed the advice of rights form at 3:12 p.m., and Detective Braxton began the interview. Detective Braxton testified that Defendant "spoke intelligently" and was "very articulate." Detective Braxton advised Defendant of his rights again before Defendant gave his second statement. Detective Braxton testified that Defendant "seemed very remorseful when he gave the second statement." Detective Braxton testified that if Defendant had exhibited signs of being intoxicated, he would have terminated the interview. Detective Braxton also testified that Defendant did not request an attorney during the interview.

Defendant testified that he was arrested on December 17, 2009, and taken to the police station. He did not remember speaking with Detective Braxton. Defendant testified that he "remember[ed] telling them that [he] didn't know what he was talking about." He testified that the only thing about the interview he remembered was when Detective Braxton gave him a cup of water and checked his hands for gunpowder residue. He did not remember reading or signing the advice of rights form or giving two statements. Defendant testified that he could not remember "because [he] had weed in [his] system, and cocaine and 'shrooms."

-5-

Defendant testified he "was hallucinating." He testified that he ingested mushrooms one hour before police arrested him at his grandmother's house. He explained the hallucinations as "[l]ike lights and stuff be [sic] different, just lights get bigger. Saw a chair get bigger in the room, or whatever." Defendant testified that his "mind just be [sic] somewhere else, just roaming." Defendant testified that he could read and he completed school through eighth grade.

At the conclusion of the suppression hearing, the trial court accredited Detective Braxton's testimony and denied Defendant's motion to suppress the statements. The trial court found that Defendant's second statement was "a very detailed statement" that was consistent with statements Detective Braxton took from the victim and Jessica Thomas.

On appeal from a trial court's ruling on a motion to suppress, the trial court's findings of fact should be upheld unless the evidence preponderates to the contrary. *State v. Hanning*, 296 S.W.3d 44, 48 (Tenn. 2009). The credibility of witnesses, the weight and value of the evidence, and the resolution of conflicts in the evidence are matters entrusted to the trial judge. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). However, when the trial court's findings of fact at a suppression hearing are based solely on evidence not requiring credibility determinations, "the rationale underlying a more deferential standard of review is not implicated." *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000). Such findings of fact are reviewed de novo. *State v. Payne*, 149 S.W.3d 20, 25 (Tenn. 2004).

"The Fifth Amendment to the United States Constitution provides in part that 'no person . . . shall be compelled in any criminal case to be a witness against himself.'" *State v. Thacker*, 164 S.W.3d 208, 248 (Tenn. 2005) (quoting U.S. Const. amend. V). "Similarly, Article I, section 9 of the Tennessee Constitution states that 'in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself.'" *Id*. (quoting Tenn. Const. art. I, § 9). Notwithstanding, an accused may waive his right against self-incrimination. *Id*. (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). The accused's waiver of his right against self-incrimination under Miranda must be made intelligently, knowingly, and voluntarily to be held constitutional. *Id*. (citing *Miranda*, 384 U.S. at 444).

The United States Supreme Court has interpreted the Fifth Amendment in part to require that an incriminating statement or confession be freely and voluntarily given in order to be admissible. This even applies to statements obtained after the proper *Miranda* warnings have been issued. Statements and confessions not made as a result of custodial interrogations must also be voluntary to be admissible. It must not be extracted by "any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." Moreover, due process requires that confessions tendered in response to either physical or psychological coercion be suppressed. This has evolved into

the "totality of circumstances" test to determine whether a confession is voluntary. *Id.* (internal citations omitted). Thus, to determine whether an accused's statements were voluntary, the appellate courts review the totality of the circumstances surrounding the waiver of the right against self-incrimination. *Id.* at 249 (citing *State v. Stephenson*, 878 S.W.2d 530, 545 (Tenn. 1994), abrogated on other grounds by State v. Saylor, 117 S.W.3d 239 (Tenn. 2003)).

We conclude that the evidence supports the trial court's finding that Defendant's statements to police were freely and voluntarily made. Detective Braxton testified that Defendant did not appear to be under the influence of any drug or intoxicant. He testified that Defendant was "neat" in appearance and that he was articulate. Defendant's second statement included details that were corroborative of the investigation. The trial court accredited Detective Braxton's testimony, and the evidence does not preponderate against the trial court's finding. Defendant is not entitled to relief on this issue.

*Sufficiency of the evidence*

Defendant next challenges the sufficiency of the evidence supporting his conviction for attempted especially aggravated robbery. Specifically, Defendant asserts that the State failed to establish beyond a reasonable doubt that the victim suffered serious bodily injury.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. *See State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." *Id.*; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." *State v. Pendergrass*, 13 S.W.3d 389, 392–93 (Tenn. Crim. App. 1999). The standard of proof is the same, whether the evidence is direct or circumstantial. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "'is

the same whether the conviction is based upon direct or circumstantial evidence.'" *Id.* (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." *State v. Sisk*, 343 S.W.3d 60, 67 (Tenn. 2011).

Defendant was convicted of attempted especially aggravated robbery. Especially aggravated robbery is robbery accomplished with a deadly weapon where the victim suffers serious bodily injury. Tenn. Code Ann. § 39-13-401(a). Robbery is the intentional or knowing theft of property from the person of another by violence of putting the person in fear. Tenn. Code Ann. § 39-13-401(a). "Serious bodily injury" is defined as "bodily injury that involves: (A) A substantial risk of death; (B) Protracted unconsciousness; (C) Extreme physical pain; (D) Protracted or obvious disfigurement; [or] (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty[.]" Tenn. Code Ann. § 39–11–106(a)(34).

> A person commits criminal attempt when the person, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a)(3) (2010 Repl.).

Defendant contends that the evidence at trial was insufficient to show that the victim suffered serious bodily injury. Defendant cites *State v. Sims*, in which this court held that the evidence of the victim's injuries were insufficient as a matter of law to support a finding of serious bodily injury based on extreme physical pain or protracted or obvious disfigurement. 909 S.W.2d 46, 49–50 (Tenn. Crim. App. 1995), *abrogated on other grounds by State v. Charles Justin Osborne*, No. 01C01–9806–CC–00246, 1999 WL 298220 (Tenn. Crim. App., at Nashville, May 12, 1999). In *Sims*, the victim suffered a broken nose, a bruised cheekbone, and two black eyes as a result of being struck in the face with a pistol. *Id.* at 48. Interpreting the statutory meaning of "extreme physical pain," this court reasoned, "[w]e do not believe that the pain commonly associated with a broken nose is extreme enough to be in the same class as an injury which involves a substantial risk of death, protracted unconsciousness, protracted or permanent disfigurement or the loss or impairment of the use of a bodily member, organ or mental faculty." *Id.* at 49.

Within one week after Defendant's brief was filed in this case, the Tennessee Supreme Court released its opinion in *State v. Farmer*, 380 S.W.3d 96 (Tenn. 2012). The State did not mention *Farmer* in its brief which was filed almost two months following the release of the opinion. In *Farmer*, our supreme court clarified the definition of serious bodily injury and held that a gunshot wound does not necessarily cause bodily injury that involves "a substantial risk of death." In that case, the victim was shot in the leg. The bullet passed through the victim's leg. The wound required minimal medical treatment and did not cause the victim to suffer a loss of consciousness, extreme pain, disfigurement, or impairment. The court noted that hospital records classified the victim's pain as "mild" to "moderate" and that the victim did not testify as to the degree of pain he experienced. *Id*. at 101. The court concluded that "[a] jury could not reasonably infer from [the victim]'s testimony, the hospital records, and the nature of his injury that [the victim]'s wound involved extreme pain." *Id*. at 101-102. The court vacated the defendant's conviction for especially aggravated robbery, finding that the State failed to present sufficient proof of a serious bodily injury, and modified Defendant's conviction to aggravated robbery. *Id*. at 103.

In the case *sub judice*, Defendant was convicted of attempted especially aggravated robbery. We conclude that it is unnecessary for the proof to show that Defendant actually inflicted serious bodily injury to the victim for the evidence to support his conviction. To sustain a conviction for attempt, "the proof must only show that [Defendant] took a substantial step toward completion of the crime while acting with the required culpability." *State v. Larry Darnnell Pinex*, No. M2007-01211-CCA-R3-CD, 2008 WL 4853077, at *8 (Tenn. Crim. App. at Nashville, filed Nov. 6, 2008), *perm. app. denied* (Tenn., May 11, 2009) (court concluded that proof of serious bodily injury was not necessary to sustain conviction for attempted especially aggravated burglary).

Viewed in the light most favorable to the State, the evidence shows that after the victim got out of the car in which Defendant was a passenger, Defendant retrieved a shotgun from the trunk of the vehicle, followed the victim, and ordered the victim to lay down and give him his money. Defendant then shot the victim at close range. The victim immediately fell to the ground and "started crawling to the gate – started screaming, 'Help.'" The victim underwent surgery and was hospitalized for two and a half weeks following his injury. He was also prescribed pain medication. We conclude that the proof established that Defendant took substantial steps toward committing especially aggravated robbery. Defendant is not entitled to relief on this issue.

*Sentencing*

Defendant also asserts that his sentence is excessive. Defendant argues that the trial court should not have considered his juvenile criminal history in enhancing his sentence

above the statutory minimum and that the evidence did not support the trial court's finding that Defendant was a leader in the commission of the offense. Defendant also argues that the trial court failed to properly consider all mitigating factors, including Defendant's mental condition.

In determining the proper sentence, the trial court must consider: (1) any evidence received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee, (7) any statement that the defendant made on his own behalf, and (8) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40–35–102, –103, -210; *see State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991); *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986).

Challenges to a trial court's application of enhancement and mitigating factors are reviewed under an abuse of discretion standard. *State v. Bise*, 380 S.W.3d 682, 706 (Tenn. 2012). We must apply "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Id*. at 707. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id*. at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." *Id*.

The Defendant contends that the trial court misapplied enhancement factor (1), that Defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range. Specifically, Defendant argues that the trial court erred by considering Defendant's juvenile record, and Defendant asserts that the trial court improperly "gave great weight to an inappropriate component of the prior criminal history enhancement factor[.]" We note that the transcript of the sentencing hearing reflects that the trial court, in applying enhancement factor (1), found that in addition to Defendant's prior aggravated robbery conviction in 2003, "[t]his court also finds that as part of his juvenile record that [Defendant] has been arrested; that he has been adjudicated delinquent of other offenses while as a juvenile, and the court gives great weight to his juvenile history."

In *State v. Jackson*, the Tennessee Supreme Court considered whether enhancement factors (1) and (16) (regarding enhancement of a sentence based on a defendant's prior juvenile record) were mutually exclusive. 60 S.W.3d 738, 742 (2001). The court stated, "[b]ecause the legislature is not presumed to have passed or enacted useless legislation,

factor (1) must necessarily apply only to adult criminal conduct, and factor (20) [as amended, factor (16)] must apply exclusively to juvenile adjudications of delinquent acts." *Id.* (internal citation omitted). Although Defendant asserts that the trial court improperly considered Defendant's juvenile record under enhancement factor (1), we conclude that the trial court's consideration of Defendant's juvenile record was not error and could properly be considered under enhancement factor (16), which states, "[t]he defendant was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult." Tenn. Code Ann. § 40-35-114(16) (2010 Repl.). Furthermore, even without the trial court's consideration of Defendant's juvenile record, the trial court properly applied enhancement factor (1) based on Defendant's prior conviction for aggravated robbery.

The Defendant also contends that the trial court misapplied enhancement factor (2), that Defendant was a leader in the commission of an offense involving two or more criminal actors. The record supports the trial court's finding. According to the victim's testimony and Defendant's statement, Defendant got out of the vehicle alone, retrieved a shotgun from the trunk, and shot the victim in the leg. Defendant asserts that because there was evidence that Defendant did not know the victim, and that Ms. Lewis and Ms. Thomas "concocted the scheme" to rob the victim, Defendant was not a leader in the commission of the offense. We disagree. Enhancement for being a leader in the commission of the offense does not require the defendant to be the sole leader but only that he be "a" leader. *State v. Hicks*, 868 S.W.2d 729 (Tenn. Crim. App. 1993).

Finally, Defendant asserts that the trial court erred by failing to consider Defendant's mental condition in mitigation of his sentence. Defendant testified at the sentencing hearing that he underwent a psychological evaluation and that he was told he had "[e]xtreme emotion[al] problem[s]," but that he forgot his other diagnosis. Defendant testified that he did not complete his court-ordered treatment because his family could not afford to pay for it. The trial court found that there was nothing in the record to indicate that Defendant was "not competent." We conclude that the trial court did not err in refusing to give weight to this mitigating factor.

Defendant's sentence is within the statutory range, and the trial court followed the statutory sentencing procedure and made findings of fact that are supported in the record. Sufficient evidence exists to support Defendant's sentence. Because the application of enhancement and mitigating factors to adjust a sentence was rendered advisory by the 2005 amendments, we reiterate that the trial court may set a sentence anywhere within the applicable range so long as the sentence is consistent with the principles and purposes of the Act, regardless of the presence or absence of mitigating and enhancement factors. The trial court in this case thoroughly considered the purposes and principles of the Sentencing Act

in rendering its decision.  We conclude that the trial court did not abuse its discretion in setting Defendant's sentence.  Defendant is not entitled to relief on this issue.

## CONCLUSION

The judgment of the trial court is affirmed.


_____
THOMAS T. WOODALL, JUDGE