IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs January 4, 2018

## STATE OF TENNESSEE v. JASON LEVI BUTTS

**Appeal from the Circuit Court for Tipton County**
No. 8700     Joe H. Walker, III, Judge

_____

### No. W2017-00584-CCA-R3-CD

_____

The Defendant, Jason Levi Butts, fired a shot from a rifle toward a home, and the bullet penetrated the wall and hit the sleeping victim in the hip. The trial court ruled that all three statements which the Defendant made to law enforcement during the investigation of the shooting were admissible. The Defendant was convicted after a bench trial of reckless endangerment, a Class C felony, and reckless aggravated assault, a Class D felony, and the trial court sentenced him to concurrent sentences of three and two years, respectively. The Defendant appeals, asserting that the trial court erred in denying his motion to suppress his statements and that the evidence is insufficient to support the verdicts. We conclude that the trial court erred in admitting the Defendant's initial statement to police, which he made without being advised of his rights and after law enforcement twice told him he could not leave the police station. However, we conclude that the error was harmless beyond a reasonable doubt, and we affirm the convictions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

Bryan R. Huffman, Covington, Tennessee, for the appellant, Jason Levi Butts.

Herbert H. Slatery III, Attorney General and Reporter; Andrew C. Coulam, Assistant Attorney General; Mark E. Davidson, District Attorney General; and Walter Freeland, Jr. (at motion hearings and sentencing) and Sean Hord (at trial), Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL AND PROCEDURAL HISTORY

The Defendant was involved in a quarrel with Mr. Myron Robinson, and on April 23, 2016, he drove with some companions to a mobile home where they expected to find Mr. Robinson. The Defendant observed Mr. Robinson's vehicle and shot his rifle toward the home, where the victim, Ms. Dana Rapp, was asleep in bed next her nine-year-old daughter. Numerous other individuals, including Mr. Robinson and several minors, were in the home. Ms. Rapp suffered a gunshot wound to her hip. The Defendant gave police a statement two days later at the police station, acknowledging that he was present at the shooting but asserting that the shooter was a passenger in his vehicle. The Defendant was arrested at his mother's home two days after his initial statement. Law enforcement officers contacted the Defendant's mother by telephone for permission to search her home, and the Defendant spoke to her within earshot of law enforcement, acknowledging that he had shot a woman. The Defendant then gave a third statement after his arrest, in which he admitted that he drove to the house and fired a random shot. He expressed remorse for his actions. Prior to trial, the Defendant moved to suppress all three statements.

## Motion to Suppress

Detective Jay Rodriguez of the Tipton County Sheriff's Office testified that he was called to investigate the crime and that he developed the Defendant as a suspect approximately two days after the shooting. On April 25, 2016, at around 2:30 p.m., the Defendant drove himself to the police station for an interview. The Defendant indicated during the interview that he believed his presence was related to a drug seizure that had occurred at a trailer which he owned and rented to tenants. The interview was video recorded and took place in an area of the building that required a code for either entry or departure.

Detective Rodriguez testified that the Defendant was not under arrest and was free to go at any time. He was not informed of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). The Defendant testified that he did not believe he was under arrest but also did not feel "free to go," in particular because he could not access his keys. He clarified, however, that "nobody had them. It was in an office." The Defendant and Detective Rodriguez agreed that there were two to three officers who were "in and out" of the room during the interview.

The video of the interview, which contains frequent lapses in audio, was attached as an exhibit. The Defendant was interviewed in a small room with a circular table.

While one officer was sitting closer to the door than the Defendant, the Defendant had a direct and unobstructed route to the door. The interview began conversationally, with the Defendant describing how he suffered from a sinus infection. The parties discussed the seizure of drugs from the tenants at the trailer owned by the Defendant.

Detective Rodriguez began the interview by asking the Defendant about an injury over his eye, and the Defendant stated that he fell onto a nail while moving a box of books. Detective Rodriguez then told the Defendant that he was not under arrest and that he could go at any time he wanted. Demonstrating that the door to the room remained unlocked, Detective Rodriguez stated, "There's the door, right?" Detective Rodriguez discussed the drug seizure at the trailer briefly, then began to ask the Defendant regarding his whereabouts on the night of the shooting.

The Defendant gave a statement essentially asserting that he had been ill on the day of the shooting and had remained at home except for a trip to the doctor and the pharmacy. He initially denied knowing anyone named Myron but then acknowledged that he knew Mr. Robinson and that he had heard one of the tenants of his trailer discussing Mr. Robinson earlier in the week.

Detective Rodriguez asked the Defendant if law enforcement could examine his telephone. The Defendant deflected the question, stating that it was in his vehicle. Asked again a few minutes later, he stated it would be an invasion of his privacy. After further discussion of the drug seizure at the Defendant's trailer, Detective Rodriguez asked if the Defendant's telephone would confirm that he had been at his residence during the time of the shooting. At that point, the Defendant asserted that he had misplaced his telephone on the day of the shooting and that he only regained possession later that weekend.

Detective Rodriguez absented himself from the room briefly. While he was gone, the Defendant asked Detective Brandon Shelton, "Am I free to go?" Detective Shelton responded, "Let me ask him real quick." After stepping out of the room, Detective Shelton informed the Defendant, "Hey, man, we got a couple more questions." Detective Shelton proceeded to offer the Defendant water or a "tic tac." The Defendant stated that he just wanted to go home and sleep.

When Detective Rodriguez returned to the room, he accused the Defendant of lying. He told the Defendant, "It's fixing to be bad on you." The Defendant responded, "Okay. Well, then, lawyer." Detective Rodriguez did not ask the Defendant further questions but told him, "Let me walk out to your car. I'm going to take your phone. I'm seizing your phone." The Defendant objected, and Detective Rodriguez responded that he would get a warrant. All present left the room for three minutes.

The Defendant and officers returned to the room and the following exchange occurred:

Defendant: Am I under arrest?

Detective Rodriguez: No, we're fixing to get a sear— You can't leave. We're fixing to get a search warrant on the truck.

Defendant: How can I not leave? I'm not under arrest?

Detective Rodriguez: You can go walk all you want to, bubba.

The room was again abandoned, but the audio reveals that Detective Rodriguez was nearby describing the evidence that could support a search warrant. He noted that the Defendant was "out there now. He's trying to leave. He won't let us get his phone." Detective Rodriguez described the Defendant as "out there somewhere with" Detective Shelton. Detective Sherry Wassel can then be heard recounting that the Defendant was searching for his telephone in the car with Detective Shelton watching, that she offered to help, and that she located the telephone, which she felt the Defendant was trying to hide.

Testifying at the motion to suppress, the Defendant stated that he went out to his car, which was unlocked, to look for the telephone. He testified that Detective Wassel escorted him outside and that she continually accused him of lying and urged him to tell the truth. She asked him what happened, reminding him he was not being recorded while they were outside. Detective Shelton likewise reminded him he was not being recorded and urged him to tell the truth. The Defendant testified he was accompanied by officers the entire time he was out of the building.

When the Defendant returned to the room, he acknowledged that on the night of the crimes, he went to confront Mr. Robinson, who had stolen six hundred dollars from him in the past. The Defendant still denied involvement with any shooting. After further encouragement to confess, the Defendant stated that "it was supposed to be a warning shot, and I didn't even fire it." He eventually described driving from his rented trailer to his home with two companions, retrieving a rifle and one round of ammunition, and driving to two different houses looking for Mr. Robinson. At the second house, the Defendant saw Mr. Robinson's vehicle, turned around, and stopped by the driveway. According to the Defendant's statement, a lanky African-American man who "dresses like a thug," had the gun and instead of firing over the house, shot into the house. This same man told the Defendant he had disposed of the bullet casing.

- 4 -

The Defendant's statement was reduced to writing and signed by the Defendant. Only the first page of the statement, in which the Defendant asserted he had been at his home the entire time, is contained in the appellate record. After the Defendant gave the statement, the following exchange took place:

Defendant: Am I going to jail?

Detective Wassel [incredulous]: Today? Or in general?

Defendant: In general.

Detective Wassel: You may…. You're not going today.

The Defendant asked if he could get his telephone back but was told it had not been examined because it was out of battery. He was asked to ride with officers to his home to retrieve the weapon while his vehicle was processed. The Defendant observed an officer in the hallway and told Detective Wassel, "That's a corrections officer…So I'm probably about to get back there."[1] After giving his permission for police to process his vehicle, the Defendant noted that he still did not have his keys. Detective Wassel retrieved the Defendant's keys and gave him the house key necessary for him to return home and to retrieve the firearm in the company of police officers. She kept the Defendant's car key in order to process the vehicle.

At the hearing, Detective Rodriguez testified that he did not have the keys to the Defendant's vehicle and denied telling the Defendant that "he could leave, but he had to walk." Detective Rodriguez at first acknowledged telling the Defendant that law enforcement would need to take his vehicle because it was part of the investigation, but he later stated, "I don't even know if I told him I was going to seize his vehicle[;] I told him I was going to seize his phone." The Defendant, testifying regarding the interview, could not recall Detective Rodriguez making any statement regarding whether he could leave or whether he would have to walk.

The Defendant was permitted to depart the police station later that day. He did not seek out a lawyer between April 25th and April 27th.

On April 27, 2016, Detective Rodriguez arrived at the Defendant's mother's home, initially looking for one of the men that the Defendant had named as his companion on the night of the shooting. When the Defendant answered the door, he was

---

[1] While this statement is slightly garbled on the recording, it appears that the Defendant was stating that he expected to be taken to jail.

- 5 -

arrested. He was not given warnings pursuant to *Miranda*. When asked if he lived at the house, the Defendant stated it was his mother's home. Detective Rodriguez called the Defendant's mother to ask consent to search the house based on an emanating odor of marijuana. The Defendant's mother asked to speak to the Defendant, and Detective Rodriguez put her on speakerphone. Detective Rodriguez testified that the Defendant told his mother that "he had messed up," and that "he shot a woman." According to Detective Rodriguez, a deputy standing nearby recorded the conversation on his body microphone, but no recording was introduced into evidence.

Back at the police station, the Defendant was informed of his *Miranda* rights. He chose to speak to police, and a second statement was reduced to writing and signed by the Defendant. In it, the Defendant acknowledged that he was with a group of people who were under the influence of drugs and alcohol and that they went looking for Mr. Robinson, intending to rob him in retribution for a robbery Mr. Robinson had committed earlier. The Defendant stated that he stopped by his home to get the rifle and that the group drove to two houses looking for Mr. Robinson. When they saw Mr. Robinson's vehicle at the second house, the Defendant shot out of the truck window. He stated, "I didn't aim for anything in particular[;] I just shot." He expressed remorse for having injured the victim, wished her "a speedy and well recovery," and offered his apology to her.

The Defendant confirmed that on April 27th, Detective Rodriguez was looking for another individual at the Defendant's mother's home. Detective Rodriguez put the Defendant in handcuffs and searched the house. The Defendant spoke to his mother while three deputies were nearby. He testified that he made the second written statement only to clarify the first statement.

The trial court denied the motion to suppress. With respect to the April 25th interview, the court found that "the defendant was not in custody, and in fact left after the interview. There was no need for *Miranda* warnings." The trial court then concluded that the word "lawyer" was not an unambiguous request for an attorney. The trial court found that the Defendant's statement to his mother was not the result of police interrogation. Finally, the trial court found that the Defendant was properly advised of his rights prior to making the third statement and that it was given freely and voluntarily.

**Trial**

The Defendant waived his right to a trial by jury, and the case proceeded to a bench trial. The parties stipulated that Detective Rodriguez's testimony would be consistent with his testimony at the hearing on the motion to suppress.

The victim testified that in the early morning hours of April 23, 2016, she was sleeping in bed inches from her nine-year-old daughter. Her husband, her sister-in-law, and five other guests were awake in the living room. The victim heard a loud noise and felt that she had been shot in her hip. Her husband "snatched" their child out of the bed in case there were subsequent shots and then applied pressure to the victim's wound. The victim lost consciousness but briefly woke up to find detectives "everywhere in my home."

The victim testified that she suffered from post-traumatic stress disorder, and medical records confirming this were introduced.[2] The victim also suffered from depression, anxiety, and panic attacks as a result of the shooting. She was undergoing treatment from a specialist for pain management. At the time of trial, the victim needed a cane to walk, and she anticipated having to have a hip replacement. She testified that she needed help getting dressed and with other tasks. Her children were suffering academically and psychologically as a result of the shooting.

Detective Rodriguez described his investigation of the scene. He was able to observe the bullet hole in the wall of the home and could see where it entered and exited the mattress. Using a straight rod, he tracked the path of the bullet, determining that it came from "lower ground," possibly thirty inches off the ground. There was a bush in the area from which Detective Rodriguez believed the bullet was fired. He testified that officers determined that the shot came from "down the driveway," either from the bush "or [the perpetrators] were sitting on their knees and firing it up." He testified that he had three people look through the bush and found no damage from a bullet passing through. He did not inspect the tree line and could not say whether the bullet had changed trajectory. Detective Rodriguez testified that the victim's house was set back from the road by approximately the length of a football field. Detective Wassel swabbed the Defendant's truck to test for gunshot residue, but Detective Rodriguez was not aware that any was found. The Defendant's rifle was approximately four feet long.

Detective Rodriguez reiterated that the Defendant in his first statement admitted to attempting to rob Mr. Robinson and to providing the car and firearm but denied firing the bullet. The Defendant gave officers consent to retrieve the gun from his home. In his second statement, the Defendant made an admission to his mother that he had "messed up" and "shot a woman." He then gave a third statement acknowledging that he was planning to rob Mr. Robinson because Mr. Robinson had previously robbed him. He

---

[2] The record indicates that documents regarding hospital and doctor visits were also introduced in this exhibit, but only one sheet of paper, documenting the victim's post-traumatic stress disorder, is in the appellate record.

acknowledged shooting at the house. Detective Rodriguez testified that the Defendant had a circular cut on his eye which "looked as if a scope might have hit his eye."

The trial court found the Defendant guilty of reckless endangerment and reckless aggravated assault. At sentencing, the victim testified regarding the profound impact the shooting had on her life, and the Defendant's mother testified that she would be able to help the Defendant if he were to receive alternative sentencing. The trial court sentenced the Defendant to concurrent sentences of two and three years, with 360 days to be served in prison and the remainder through the community corrections program.

## ANALYSIS

### I. Motion to Suppress

The Defendant asserts that the trial court erred in denying his motion to suppress his statements. A trial court's findings of fact in a suppression hearing are binding on the appellate court unless the evidence preponderates against them. *State v. Clark*, 452 S.W.3d 268, 282 (Tenn. 2014). When the findings are not based on witness credibility, the appellate court may review de novo. *Id.* Determinations regarding the credibility of witnesses, the weight of the evidence, and the resolution of conflicts in the evidence are entrusted to the trial court. *State v. Echols*, 382 S.W.3d 266, 277 (Tenn. 2012). The party who prevails at the trial level is entitled to the strongest legitimate view of the evidence and to reasonable and legitimate inferences which may be drawn from it. *Id.* An appellate court may consider evidence adduced at trial in determining the correctness of a ruling on a motion to suppress. *State v. Sanders*, 452 S.W.3d 300, 306 (Tenn. 2014). The trial court's legal conclusions are reviewed de novo. *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001). "[W]here the evidence includes a complete and accurate videotape depiction of the police interview which is the subject of the suppression hearing, the trial court's findings of fact with respect to the matters depicted on the videotape are also subject to de novo review." *State v. Dailey*, 273 S.W.3d 94, 100 (Tenn. 2009).

Under the Fifth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution, the accused may not be compelled to incriminate himself. These protections are "concerned with the inherently coercive atmosphere that accompanies interrogation (or its functional equivalent) by the police." *Sanders*, 452 S.W.3d at 311. When a defendant is subjected to custodial interrogation, law enforcement must inform the defendant of his constitutional rights, including that he has the right to remain silent, that his statement may be used against him, that he has the right to the assistance of an attorney, and that he will be appointed an attorney if he cannot afford one. *Miranda*, 384 U.S. at 479. The suspect must have the opportunity to either

assert these rights or to knowingly and intelligently waive them. *Id.* "'But unless and until such warnings and waiver are demonstrated by the prosecution at trial,' statements given during custodial interrogation are not admissible in the prosecution's case-in-chief." *State v. Climer*, 400 S.W.3d 537, 557 (Tenn. 2013) (quoting *Miranda*, 384 U.S. at 479). Even statements that are voluntarily made will be excluded if they are the result of custodial interrogation without adequate warnings. *State v. Payne*, 149 S.W.3d 20, 32 (Tenn. 2004). "To constitute a 'custodial interrogation,' (1) the subject must be 'in custody'; (2) there must be an interrogation; and (3) the interrogation must be conducted by a state agent." *State v. Smith*, 933 S.W.2d 450, 453 (Tenn. 1996) (quoting *Miranda*, 384 U.S. at 444). "As the *Miranda* Court emphasized, however, these warnings are not required in the absence of custodial interrogation." *State v. Northern*, 262 S.W.3d 741, 749 (Tenn. 2008).

## A. Initial Statement

The Defendant asserts that he was in custody during his initial statement to police and that his statement should accordingly have been ruled inadmissible because he was not informed of his rights. The State counters that the Defendant was not in custody and that his initial confession was consequently admissible.

A person is in custody for the purposes of analysis under *Miranda* when there is "'a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *State v. Anderson*, 937 S.W.2d 851, 854 (Tenn. 1996) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). The test is "'whether, under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest.'" *Dailey*, 273 S.W.3d at 102 (quoting *Anderson*, 937 S.W.2d at 855). This is an objective test, and the subjective suspicion of law enforcement that the suspect has committed a crime is not relevant to the inquiry. *Payne*, 149 S.W.3d at 32-33.

> Some factors relevant to that objective assessment include the time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally, the extent to which the suspect is made

aware that he or she is free to refrain from answering questions or to end the interview at will.

*Anderson*, 937 S.W.2d at 855. Any other factors bearing on the totality of the circumstances in which the interrogation was conducted may also be relevant in determining whether an interrogation was custodial. *Id.*

We note that, despite the fact that making the factual determination relevant to custody is "a task for which the trial court is especially suited," this record presents us with a paucity of factual findings to aid review. *Id.* The trial court made no findings about how the Defendant arrived at the police station or how he left, under what circumstances he went outside with Detective Wassel, or whether his possessions or mode of transportation were confiscated. Moreover, neither the trial court nor the parties make any reference to the Defendant's rebuffed attempts to leave the police station, facts which we deem particularly salient for our review.

The record shows that the interview took place at the police station and lasted approximately four hours. The Defendant told officers that he believed he was there regarding drug activity at his rented trailer, and the questioning was initially conversational. The Defendant arrived by driving himself to the station, and three police officers came in and out of the room, assisting with the interview at various times. The Defendant was in a room with an unlocked door that was in a section of the station requiring a code for entry or exit. The Defendant's key chain, which contained both his vehicle and house key, was removed from his possession. His telephone was later seized. The Defendant was initially told that he could leave at any time and was not confronted with any accusations.

However, when the Defendant became aware that his telephone could be used to track his whereabouts, he asked Detective Shelton, "Am I free to go?" Detective Shelton responded that he would have to ask Detective Rodriguez, and when he returned, he told the Defendant, "Hey, man, we got a couple more questions." He then offered the Defendant refreshments. The Defendant was soon thereafter confronted with accusations, and he was told that his telephone would be seized.

The Defendant asked if he was under arrest, and he was told, "No…. You can't leave. We're fixing to get a search warrant on the truck." When the Defendant attempted to clarify why he was being held if he was not under arrest, Detective Rodriguez responded, "You can go walk all you want to, bubba." The Defendant then went to his vehicle in the company of law enforcement officers, and Detective Rodriguez described him as "out there now. He's trying to leave. He won't let us get his phone." The Defendant located his telephone, and he ultimately confessed to some involvement with

the crime. His house and car keys were in the possession of police until the very end of the interview, when Detective Wassel gave the Defendant the house key so that he could accompany officers to retrieve the gun.

At the beginning of the interview, the Defendant, who was in a secured location within the building but was told he could leave at any time and was not otherwise restrained, was not in custody. However, an interview which begins as non-custodial may ripen into a custodial interview when circumstances lead to the conclusion that a reasonable person in the suspect's position would no longer consider himself or herself free to leave but instead feel deprived of freedom of movement to the degree associated with a formal arrest. *Payne*, 149 S.W.3d at 34-35 (holding that the defendant was in custody "at the latest when the interview resumed following the first break"); *see State v. Daniel*, 12 S.W.3d 420, 427 (Tenn. 2000) ("However, what begins as a consensual police-citizen encounter may mature into a seizure of the person.").

In this case, after the Defendant became aware of the suspicions of law enforcement, he asked Detective Shelton directly if he was free to go. Detective Shelton told the Defendant that he must consult with Detective Rodriguez and then said, "Hey, man, we got a couple more questions," offering the Defendant refreshments. This answer amounts to a negative. After a confrontation regarding the telephone, during which the Defendant brought up the word, "lawyer," the Defendant asked if he was under arrest, and Detective Rodriguez responded, "No…. You can't leave." Although Detective Rodriguez then told the Defendant that he could "walk," the record indicates that law enforcement in fact accompanied the Defendant when he left the building and that they retained possession of the Defendant's house key as well as his car key, and later, his telephone. *See Daniel*, 12 S.W.3d at 427 ("Without his identification, [the defendant] was effectively immobilized."). The Defendant was described by law enforcement as "trying to leave."

We conclude that, under the totality of the circumstances, a reasonable person in the Defendant's position, after having been told twice he could not leave and while dispossessed of his house key, his car key, and his telephone, would have felt deprived of freedom of movement to the degree associated with a formal arrest. It is probable that law enforcement did not intend to take the Defendant into custody or to arrest him on that day, but the determinative inquiry is whether a reasonable person in the suspect's position would have felt he was in custody and not whether law enforcement subjectively intended to place him into custody. *See Payne*, 149 S.W.3d at 32-33. Although the trial court relied on the fact that the Defendant was ultimately permitted to depart, we do not think that his release from custody later in the day erases the fact that prior to his making a statement, he was twice told by law enforcement that he could not leave the police station. Accordingly, the Defendant was in custody at the time that he made the first

incriminating statements, and he should have been apprised of his rights under *Miranda*. *See Dailey*, 273 S.W.3d at 103-04 (holding that the defendant was in custody when the interview was not prolonged and some of it was conversational, but he was told that the police had sufficient evidence to charge him with murder and was never told he was free to leave or refrain from answering questions); *Payne*, 149 S.W.3d at 34 (holding that the defendant was in custody when he drove himself to the station, was told he could leave, and was initially spoken with empathetically, but when the tone of the interview became accusatory and then combative, the defendant's access to the door was blocked, and the defendant attempted to leave unsuccessfully three times).

The Defendant asserts that his statement, "Well, then, lawyer," was an unequivocal request for counsel, and the State disagrees. A request for an attorney relates to the invocation of the right to counsel, waiver of the right, or revocation of a waiver. *See Climer*, 400 S.W.3d at 564 (noting that the prosecution had to show that the accused affirmatively waived his rights, not merely that the invocation of the right to counsel was insufficient). In this case, the Defendant was not informed of his rights under *Miranda*, and "'unless and until such warnings and waiver are demonstrated by the prosecution at trial,' statements given during custodial interrogation are not admissible in the prosecution's case-in-chief." *Id.* at 557. Accordingly, the trial court erred in not excluding the Defendant's initial statements to law enforcement.

We must now evaluate the effect of this error on the Defendant's convictions. "The erroneous admission of evidence obtained in violation of a defendant's *Miranda* rights is a non-structural constitutional error, and as such, is subject to … harmless error analysis." *Id.* at 569-70. The question is "'whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Id.* at 569 (quoting *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008)). The State has the burden of demonstrating that the error was harmless. *Rodriguez*, 254 S.W.3d at 371. The fact that the trial was largely uncontested and that the State did not introduce the testimony of any of the witnesses who were in the vehicle necessarily makes this determination more difficult.

In evaluating the effect of this error, we note that the Defendant does not present an argument for excluding his final statement, which was made two days after the initial statement and which was preceded by *Miranda* warnings.[3] The Defendant initially

---

[3] The Tennessee Supreme Court has analyzed the admissibility of a confession made after proper warnings but following an illegally obtained confession under three separate tests. *See Dailey*, 273 S.W.3d at 107-12. The subsequent confession is analyzed under the nine factors in *State v. Smith*, 834 S.W.2d 915, 919-20 (Tenn. 1992) to determine whether the State has rebutted the presumption raised under the Tennessee Constitution that the subsequent confession is tainted. *Northern*, 262 S.W.3d at 763-66. The Tennessee Supreme Court has also applied both tests of admissibility found in *Missouri v.*

acknowledged some involvement in the crime while he was interrogated in police custody without having received *Miranda* warnings. However, the Defendant then departed the police station, and he gave a subsequent confession two days later, after he was arrested at his home. The Defendant was advised of his rights during his formal arrest, and in his second written statement, he acknowledged that he was the shooter.

The Defendant raises no challenge to the admissibility of his subsequent, *Mirandized* statement. He simply presents no argument for the subsequent statement's exclusion, and we accordingly conclude that the admission of the first statement was harmless beyond a reasonable doubt. *See State v. Munn*, 56 S.W.3d 486, 498 (Tenn. 2001) (concluding that admitting the defendant's inadmissible confessions to his parents was harmless beyond a reasonable doubt in the guilt phase when the defendant made largely duplicative and admissible statements to the police); *State v. Bates*, 804 S.W.2d 868, 876 (Tenn. 1991) (holding erroneous admission of statements harmless because a "trail" of evidence led "unerringly" to the defendant and because the defendant made a subsequent confession which would in any event have been admissible).

### B. Statement Made to the Defendant's Mother

The Defendant contends that the statement that he made to his mother should be suppressed because it amounted to a statement made in response to custodial interrogation and because his request for counsel made two days before was not honored. The record is clear that at the time the Defendant made the statement, he was in custody and had not been advised of his rights. The Defendant asserts that putting his mother on the telephone was inherently coercive. However, the constitutional provisions at issue "forbid official coercion, not mere 'strategic deception.'" *Sanders*, 452 S.W.3d at 312 (quoting *State v. Branam,* 855 S.W.2d 563, 568 (Tenn. 1993)). "These constitutional provisions are not concerned 'with moral or psychological pressures to confess emanating from sources other than official coercion.'" *Id.* (quoting *United States v. Erving L.,* 147 F.3d 1240, 1247 (10th Cir. 1998)).

---

*Seibert*, 542 U.S. 600, 615, 621-22 (2004): Justice Kennedy's test regarding whether a "question first" strategy was deliberately employed and whether curative measures were taken and the plurality's five-factor test used to analyze the admissibility of a subsequent confession. *Dailey*, 273 S.W.3d at 107-10; *Northern*, 262 S.W.3d at 760-63.

In *State v. Dotson*, the defendant, after invoking his right to counsel, asked to speak with his mother. 450 S.W.3d 1, 53 (Tenn. 2014). The defendant's mother was permitted to speak to him in a room by herself, and he made incriminating statements to her. *Id.* The Tennessee Supreme Court held that the record was devoid of evidence that the defendant's mother was acting as a State agent when she spoke to him and that accordingly the conversation did not amount to interrogation by the State. *Id.* at 54-55.

The defendant in *Arizona v. Mauro* likewise asserted his right to remain silent while he was in custody. *Arizona v. Mauro*, 481 U.S. 520, 527 (1987). Police officers ceased questioning but at his wife's request, allowed her to speak with him in the presence of an officer who was recording the conversation. *Id.* at 527-28. The Supreme Court concluded that allowing the defendant to speak with his wife was neither interrogation nor "the kind of psychological ploy that properly could be treated as the functional equivalent of interrogation." *Id.* at 527. The Court noted that the government was not "using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment." *Id.* at 530; *see also State v. Kendell Edward Johnson*, No. M2011-00792-CCA-R3-CD, 2012 WL 3731699, at *14-16 (Tenn. Crim. App. Aug. 29, 2012) (concluding that the statement which the defendant made to his father at the police station after asserting his right to remain silent was admissible).

Here, the Defendant was allowed to speak to his mother. Detective Rodriguez testified that the Defendant's mother asked him "what was going on" and the Defendant made incriminating statements. There is no evidence that law enforcement coerced the statements or that the Defendant's mother's unprompted and general question to him constituted the functional equivalent of police interrogation. *See Dotson*, 450 S.W.3d at 53; *Kendell Edward Johnson*, 2012 WL 3731699, at *14-16. The trial court did not err in admitting the statement.

## II. Sufficiency of the Evidence

The Defendant also challenges the sufficiency of the evidence. This court must set aside a finding of guilt if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt. Tenn. R. App. P. 13(e). The question before the appellate court is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Pope*, 427 S.W.3d 363, 368 (Tenn. 2013). This court neither reweighs nor reevaluates the evidence, nor may it substitute its inferences for those drawn by the trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). A jury's verdict of guilt, approved by the trial court, resolves conflicts of evidence in the State's favor and accredits the testimony of the State's witnesses. *State v. Smith*, 436 S.W.3d 751, 764 (Tenn. 2014). The trier of fact is entrusted with determinations

concerning witness credibility, factual findings, and the weight and value of evidence. *Id.* "This Court affords the State the strongest legitimate view of the evidence presented at trial and the reasonable and legitimate inferences that may be drawn from the evidence." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012). A guilty verdict replaces the presumption of innocence with one of guilt, and on appeal, the defendant bears the burden of demonstrating that the evidence is insufficient to support the conviction. *State v. Hawkins*, 406 S.W.3d 121, 131 (Tenn. 2013). Circumstantial evidence may, by itself, support a conviction, and the State is not required to exclude every reasonable hypothesis save guilt. *Id.*

The Defendant was convicted of reckless endangerment by discharging a firearm into an occupied habitation. To convict the Defendant, the State had to show that he recklessly engaged in conduct that placed another in imminent danger of death or serious bodily injury by discharging a firearm into a habitation which was occupied at the time. T.C.A. §§ 39-13-103(a), (b)(3); 39-14-401(1)(A), (2). A person acts recklessly "when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." T.C.A. § 39-11-302(c). The disregard of the risk must constitute a "gross deviation from the standard of care that an ordinary person would exercise under all the circumstances" as viewed from the standpoint of the accused. *Id.*

The Defendant was also convicted of reckless aggravated assault. As charged here, the State had to demonstrate that the Defendant, acting recklessly, caused bodily injury to the victim and that the assault involved the use of a deadly weapon. T.C.A. §§ 39-13-101(a)(1), -102(a)(1)(B)(iii) (2015).

The Defendant argues that, even if his confessions were properly admitted, the evidence is insufficient to support the verdict because the victim was unable to identify him and because the investigation was allegedly incomplete. He argues that the absence of gunshot residue within the truck excludes the theory that he was the shooter. However, in examining the sufficiency of the evidence, we merely evaluate whether a rational trier of fact could have found the elements of the offenses beyond a reasonable doubt. *Pope*, 427 S.W.3d at 368. The State presented evidence that the Defendant placed the numerous occupants of the home into imminent danger of death or serious bodily injury by recklessly firing a rifle through the walls of the home. Likewise, the State's proof showed that the Defendant acted recklessly in discharging a deadly weapon into the house, causing bodily injury to the victim of the gunshot. The Defendant's admissible statements to police establish his identity as the shooter. Accordingly, the evidence is sufficient to sustain the verdict.

**CONCLUSION**

Based on the foregoing reasoning, we affirm the trial court's judgments.

_____
JOHN EVERETT WILLIAMS, JUDGE